Filed 6/7/23  In re H.G. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re H.G., A Person Coming Under the Juvenile Court Law. | B322211 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 18CCJP06109A) |
| Plaintiff and Respondent, | |
| v. | |
| L.G., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Marguerite D. Downing, Judge.  Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

L.G. (mother) appeals from the juvenile court's order terminating parental rights over her child, H.G., under Welfare and Institutions Code[1] section 366.26. Mother argues the juvenile court erred in failing to apply the beneficial parental relationship exception to the termination of her parental rights (§ 366.26, subd. (c)(1)(B)(i)). Mother also asserts the juvenile court erred in finding the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) inapplicable because the Los Angeles County Department of Children and Family Services (Department) failed to inquire with maternal aunt and maternal uncle about possible Indian ancestry. Finding no prejudicial error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Dependency Petition

Mother and an unknown father are the parents of H.G., a girl born August 2018. Mother also has three older children who were the subject of prior dependency proceedings. The three older children received permanent placement services and were adopted in 2017 after mother failed to reunify with them.

The current matter came to the Department's attention in September 2018 when probation officers went to a residence in search of a juvenile offender. Mother and then-three-week-old H.G. were present in the home along with several other individuals, including a man on parole for a child sex offense and a man in possession of a loaded firearm. Although a number of baby supplies were found in the room occupied by mother and

---

[1] Unless otherwise stated, all further statutory references are to the Welfare and Institutions Code.

2

H.G., mother denied that she and the newborn resided in the home or were related to anyone who lived there. On September 19, 2018, H.G. was placed in temporary shelter care.

On September 21, 2018, the Department filed a dependency petition on behalf of H.G. under section 300, subdivisions (a), (b), and (j). The petition alleged that H.G. was at substantial risk of serious harm based on mother's conduct in creating a detrimental and endangering home environment for the child, mother's prior physical abuse of the child's older half siblings, and mother's history of mental and emotional problems. At a September 24, 2018 detention hearing, the juvenile court detained H.G. from mother. The matter was set for a jurisdictional hearing.

## 2. Jurisdictional and Dispositional Hearing

A combined jurisdictional and dispositional hearing was held on October 31, 2018. Mother pled no contest to an amended section 300 petition that alleged one subdivision (b) count based on her history of mental and emotional problems, and one subdivision (j) count based on her prior physical abuse of H.G.'s half siblings. All remaining counts were dismissed. The juvenile court sustained the petition as amended, declared H.G. a dependent of the court under section 300, subdivisions (b) and (j), and removed the child from parental custody. Mother was granted family reunification services, including drug and alcohol services, anger management, parenting education, a mental health evaluation, and individual counseling to address case issues. The court also ordered monitored visitation between mother and H.G.

## 3. Status Review Hearings

On December 1, 2018, at the age of three months, H.G. was placed in the foster home of Mr. and Mrs. M. In an April 2019

3

status review report, the Department stated that H.G. was well-loved in her foster home. Mr. and Mrs. M. were meeting the child's needs and were bonded to her. Mother had been attending monitored visitation with H.G. twice per week. She was engaged with the child, brought her gifts and combed her hair, and inquired about her doctor's appointments. Mother had not, however, been compliant with her court-ordered services. She tested positive for methamphetamines in March 2019, and missed a number of other on-demand drug tests. Although mother consistently attended individual counseling, she was dismissed from her anger management and parenting programs after she became verbally and physically aggressive with the program facilitator. She started attending new programs in anger management and parenting, but had not submitted to a mental health evaluation or enrolled in a drug treatment program.

At a six-month review hearing held on May 1, 2019, the juvenile court found that continued jurisdiction was necessary. The court also found that mother was in partial compliance with her case plan, and ordered her to continue participating in reunification services, including a full drug treatment program. The matter was set for a 12-month review hearing.

In an October 2019 status review report, the Department stated that H.G. continued to receive appropriate care in her foster home and was meeting her developmental milestones. Mother was visiting H.G. on a consistent basis and was appropriate with the child during the visits. At times, however, mother was verbally aggressive with the staff who monitored the visits and displayed anger in H.G.'s presence. With respect to her case plan, mother had completed her anger management and

parenting programs, submitted to a mental health evaluation, and made progress in her individual counseling. She also was attending a substance abuse treatment program and submitting to random drug testing in that program. Although mother was compliant with her case plan, the Department recommended she continue participating in reunification services given her ongoing anger issues and need for additional counseling.

At a 12-month review hearing held on October 30, 2019, the juvenile court again found that continued jurisdiction was necessary. The court also found that mother consistently visited H.G., and had made significant progress in resolving the issues that led to the child's removal. The court ordered mother to continue participating in reunification services, and set the matter for an 18-month permanency review hearing.

In its March 2020 status review report, the Department stated that H.G. was developing appropriately and was well-adjusted in her foster home. Mother maintained regular visitation with H.G., and during the visits, she brought the child healthy foods and age-appropriate toys, games, videos, and music. She also continued to attend individual counseling and a substance abuse program. However, her attendance in the substance abuse program had been poor, and she tested positive for marijuana in January 2020. The Department recommended the 18-month review hearing be continued to allow for further assessment of mother's compliance with her case plan.

Due to the COVID-19 pandemic, the 18-month review hearing was delayed for about a year. During this period, mother was generally compliant with her court-ordered services, but had not begun participating in a substance abuse aftercare program. She was having in-person visits with H.G. twice a week, and

FaceTime calls with the child daily. Mother and H.G. were happy to spend time together, and H.G.'s caregiver observed that the child was comfortable with mother and bonded to her. Given mother's progress, the Department decided in January 2021 to liberalize her visits to unmonitored. In February 2021, however, mother missed two consecutive drug tests and then had a positive test for cocaine. She also tested positive for marijuana a few weeks later. In March 2021, the Department recommended that mother's reunification services be terminated.

On April 14, 2021, the juvenile court held the 18-month permanency review hearing. The court found that mother's progress in addressing the causes that necessitated H.G.'s removal had not been substantial, and that the child could not be safely returned to her care. The court terminated mother's reunification services and set the matter for a section 366.26 permanency planning hearing.

**4. Section 366.26 Permanency Planning Hearing**

The section 366.26 hearing originally was set for August 2021, but had to be continued several times for paternity testing to determine H.G.'s biological father. Over the course of the proceedings, mother identified three different men as the alleged father of H.G. All three men, however, refused to claim paternity over the child, and agreed to submit to a DNA test. The results of the DNA tests ultimately showed that none of the men identified by mother was H.G.'s biological father.

In its September 2021 section 366.26 report, the Department stated that H.G.'s long-term foster parents, Mr. and Mrs. M., were committed to adopting the child and providing her with a permanent home. They had been providing H.G. with excellent care and a nurturing home environment since her

6

placement with them in December 2018. They expressed that they loved H.G. very much, and wanted to adopt her to ensure she was raised in a safe and stable home. While H.G. was too young to make a meaningful statement, she was observed to be comfortable in her foster parents' care. She showed a strong attachment to Mr. and Mrs. M., was affectionate toward them, and frequently sought them out for comfort and affection.

As of October 2021, mother was attending monitored visitation with H.G. twice per week for four hours per visit. During the visits, mother engaged well with H.G., and interacted with her at an age-appropriate level. Mother played with the child, practiced counting with her, and sang educational songs to her. H.G. was excited to see mother at the start of each visit and did not want the visits to end. Both mother and H.G. readily displayed affection toward one another, and the child referred to mother as "mommy." While the visits generally went well, there had been one incident where mother verbally threatened the monitor for refusing to extend a visit.

In a February 2022 supplemental report, the Department stated that H.G. remained stable in the home of Mr. and Mrs. M. She was bonded with her foster parents, displayed a secure attachment to them, and continued to thrive emotionally and physically in their care. Mother had regular contact with H.G. through in-person and virtual visits. Mother continued to be appropriate with H.G., and they were observed to have a healthy parent-child bond.

In a last minute information for the court filed in July 2022, the Department reported that Mr. and Mrs. M. remained committed to adopting H.G. Since the child's placement in their care, Mr. and Mrs. M. had provided her with a loving, stable, and

7

nurturing environment. H.G. was fully acclimated to her foster parents' home and was comfortable in their presence. She looked to Mr. and Mrs. M. in times of need, displayed affection toward them, and referred to them as "mommy" and "daddy." While recognizing that mother had maintained regular contact with H.G. through monitored visitation, the Department stated that the child was bonded with her foster family and that they desired to provide her with permanency through adoption. The Department recommended that parental rights over H.G. be terminated and the child be freed for adoption.

On July 11, 2022, the juvenile court held the section 366.26 hearing. In addition to admitting the reports filed by the Department, the juvenile court heard the testimony of mother. Mother testified that she attended in-person visits with H.G. three times a week, and called the child and her caregiver daily. During the calls, mother would ask the caregiver about H.G.'s behavior and medical appointments. The in-person visits generally took place at a park where mother would push H.G. on the swings, engage in water play with her, and watch her play with other children. H.G. was affectionate with mother, and would express that she wanted to go with mother at the end of their visits.

Mother's counsel asked the juvenile court not to terminate parental rights over H.G. based on the statutorily recognized exception for a beneficial parental relationship. In discussing the three-factor test set forth in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), counsel argued that mother had maintained regular visitation with H.G., that mother and H.G. shared a positive, emotional attachment, and that terminating the attachment would be detrimental to H.G. Counsel for H.G. and counsel for

8

the Department both requested the court terminate parental rights. H.G.'s counsel acknowledged that mother and H.G. had a positive relationship, but asserted that the child had been with her current caregivers for three years, and that her bond with mother did not outweigh the bond she shared with her prospective adoptive family. The Department's counsel argued that, while mother and H.G. had developed a bond during their visits, the current caregivers were the ones who provided H.G. with a consistent parent-child relationship and were able to meet her needs in a way that mother never could.

The juvenile court found by clear and convincing evidence that H.G. was adoptable, and that no exception to the termination of parental rights applied. Addressing the beneficial parental relationship exception, the court stated: "The court has reviewed the reports and . . . taken into consideration *Caden C.* [¶] The court concedes that now the mother's visits are regular and they are positive, but there is no evidence that terminating the parental bond would be detrimental to [H.G.] . . . . [¶] . . . [¶] [S]he was detained within 30 days of her birth. [¶] . . . [¶] . . . And she was placed with the caretakers two months later. [¶] She has resided with them for three years. [¶] So the court has not been provided with any evidence that terminating the parental bond would be detrimental to this child, who has been raised in the home of the caretakers. [¶] The court finds . . . there is no exception [to] adoption that applies in th[is] case." The court terminated parental rights over H.G. and ordered adoption as her permanent plan.

### 5.   ICWA Inquiry and Findings

When the Department met with mother in September 2018, she denied Indian[2] ancestry.  At that time, the Department also spoke with a maternal aunt, S.S., who reported that mother resided with her.  There is no indication that the Department inquired of maternal aunt if H.G. is or might be an Indian child.

At the September 24, 2018 detention hearing, mother submitted a parental notification of Indian status (ICWA–020) form in which she checked the box indicating she did not have Indian ancestry as far as she knew.  Based on mother's response in her ICWA–020 form, the juvenile court found it had no reason to know that ICWA applied or that H.G. was an Indian child.

At the detention hearing, mother identified a maternal uncle, D.G., as a potential caretaker for H.G.  The juvenile court ordered the Department to assess him for this purpose.  The Department had contact with maternal uncle in October 2018, but there is no indication the Department asked him whether H.G. had any Indian ancestry.

We are directed to no record of contact between the Department and extended family members of H.G. other than maternal aunt and maternal uncle.  The record reflects that no other such family members were available to the Department.  According to the October 2018 jurisdictional and dispositional report, mother told the Department that she was raised in the "foster care system."  Her mother was in prison, and she did not know her father.  She had one brother and three sisters.  The report on mother's mental health evaluation noted that she and

---

[2]     In this opinion, we use "Indian" as defined in section 1903 of title 25 of the United States Code.

her brother (maternal uncle) spent most of their childhood in and out of foster homes and did not know their biological parents. The report further stated that a foster parent who cared for mother from ages two through 12 was "the closest person [she] had to a mother." When the Department asked maternal uncle whether he knew of other relatives who might be willing to accept placement of H.G., maternal uncle responded no. No contact was made between the Department and the other two maternal aunts, and there is no indication that these maternal aunts were available to the Department.

At the October 31, 2018 jurisdictional and dispositional hearing, the juvenile court again found it had no reason to know ICWA applied or that H.G. was an Indian child. At the subsequent review hearings and the section 366.26 hearing, the court did not make any ICWA-related findings.

Mother timely appealed from the order at the section 366.36 hearing terminating her parental rights.

## DISCUSSION

### 1. Beneficial Parental Relationship Exception

On appeal, mother contends the juvenile court erred in finding that the beneficial parental relationship exception did not apply to the termination of her parental rights. In particular, she claims that the court failed to comply with the principles articulated in *Caden C.*, *supra*, 11 Cal.5th 614, and that the evidence showed H.G. shared a substantial, positive, emotional attachment with mother that would be detrimental to sever. We conclude the juvenile court did not err in finding the exception inapplicable.

11

### a. Governing law.

At a hearing under section 366.26, the juvenile court must select and implement a permanent plan for a dependent child, with the express purpose of providing the child a "stable, permanent" home. (*Id.*, subd. (b).) Where there is no probability of reunification with a parent, adoption is the preferred permanent plan. (*Id.*, subd. (b)(1).) For the court to implement adoption as the permanent plan, it must find, by clear and convincing evidence, that the child is likely to be adopted if parental rights are terminated. (*Id.*, subd. (c)(1).) Then, in the absence of evidence that a relative guardianship should be considered, or that the termination of parental rights would be detrimental to the child under one of the enumerated exceptions, the court "shall terminate parental rights." (*Id.*, subd. (c)(1)(B)(i)-(vi).) These " 'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

Under section 366.26, subdivision (c)(1)(B)(i), the beneficial parental relationship exception applies when the juvenile court determines that the termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Ibid.*) In *Caden C.*, the California Supreme Court held that a "parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the

12

parent—the kind of attachment implying that the child would benefit from continuing the relationship.  And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)

We review the juvenile court's findings as to the first two elements—whether the parent has maintained regular visitation with the child and whether the child has a beneficial relationship with the parent—for substantial evidence.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)  We review the third element— whether termination of parental rights would be detrimental to the child due to the child's relationship with the parent—for abuse of discretion.  (*Id*. at p. 640.)  The reviewing court will find an abuse of discretion "only when ' " 'the [juvenile] court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

### b.  The juvenile court did not err in finding the beneficial parental relationship exception inapplicable.

Mother argues the juvenile court's application of the beneficial parental relationship exception did not comply with *Caden C.*, *supra*, 11 Cal.5th 614, because the court failed to conduct a fact-specific inquiry of H.G.'s relationship with mother and whether severing that relationship would be detrimental to H.G.  Mother asserts the court instead made a cursory finding that, because H.G. had lived with her caregivers for three years and there was no evidence that terminating the parental bond would be detrimental to her, the exception did not apply.  This argument lacks merit.

13

In issuing its ruling, the juvenile court indicated that it had reviewed the Department's reports and considered *Caden C.* As to the first element, the court found that mother had maintained regular visitation with H.G. As to the second element, while the court did not make any express findings as to whether H.G. would benefit from continuing the relationship, it did note that mother's visits with the child were "positive" and that there was a "parental bond." As to the third element, the court explained that H.G. was detained from mother when she was less than one month old, was placed with her caregivers two months later, and had lived with the caregivers for three years. The court then stated that it had "not been provided with any evidence that terminating the parental bond would be detrimental" to H.G. On that basis, the court found the beneficial parental relationship exception did not apply.

Although it would have been a better practice for the juvenile court to make express findings as to each of the three elements of the *Caden C.* analysis for purposes of appellate review, such findings were not required. As the Sixth District explained, "we infer from section 366.26, subdivision (c)(1)(D)— under which the juvenile court is required to 'state its reasons in writing or on the record' when it makes a finding that termination of parental rights *would be* detrimental to the child—that the court is not required to make findings when it concludes that parental rights termination *would not be* detrimental." (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) The California Rules of Court also do not impose any requirement that the juvenile court make findings on the record when deciding that the termination of parental rights would not be detrimental to the child. (See Cal. Rules of Court, rule 5.725(d).)

14

Here, the juvenile court stated on the record that, after considering the evidence and the decision in *Caden C.*, there was no evidence that terminating the parental bond would be detrimental to H.G.  It is therefore evident that the court found mother did not meet her burden of establishing the third element of the *Caden C.* analysis—whether termination of parental rights would be detrimental to the child.  Mother has not shown the court misapplied the law by failing to articulate more fact-specific findings in announcing its ruling.  (*In re A.L.*, at p. 1156 [appellate court presumes juvenile court knows and correctly applies the law].)

Mother also asserts the juvenile court erred in finding the beneficial parental relationship exception did not apply because the evidence demonstrated that H.G. had a substantial, positive, emotional attachment to mother, and that it would be detrimental to sever that bond.  This claim likewise fails.  Even assuming that mother established the first and second elements of the beneficial parental relationship exception, we conclude the juvenile court did not abuse its discretion in finding mother failed to establish the third element.

In evaluating the third element—whether termination of parental rights would be detrimental to the child—the juvenile court must determine whether "the benefit of placement in a new, adoptive home outweigh[s] 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship' " with the parent.  (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  "The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home."  (*Id*. at p. 640.)  " 'If severing the natural parent/child relationship would deprive the child of a substantial, positive

15

emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Id*. at p. 633.)

Although the evidence showed that mother and H.G. had developed a positive emotional attachment over the course of their monitored visits, the juvenile court reasonably could find that the benefits H.G. would derive from a permanent, adoptive home outweighed any harm she would experience from the loss of that bond. At the time of the section 366.26 hearing, H.G. was almost four years old. She was detained from mother when she was only three weeks old, and was placed with her prospective adoptive parents, Mr. and Mrs. M., at the age of three months. H.G. had thus spent the vast majority of her life in the care of Mr. and Mrs. M., who were committed to providing her with a permanent, adoptive home.

The evidence further demonstrated that H.G. was closely bonded with her prospective adoptive family and was thriving in their care. Mr. and Mrs. M. had provided H.G. with a loving, nurturing, and stable home for three and a half years and she child was comfortable in their home. H.G. referred to Mr. and Mrs. M. as "daddy" and "mommy," frequently sought them out for comfort and affection, and relied on them to meet all of her needs. While H.G. clearly enjoyed spending time with mother and engaging in playtime together during their monitored visits, mother was never able to sustain more liberalized visitation with H.G. over the course of the four-year proceedings. Given that H.G. was only in mother's care for a few weeks following her birth, there is no evidence that they ever developed the kind of beneficial parent-child relationship that would outweigh " 'the security and the sense of belonging that a new family would

16

confer.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 633; *In re A.L.*, *supra*, 73 Cal.App.5th at p. 1159 [juvenile court did not abuse its discretion in finding the benefits the child derived from the father's consistent, positive visits did not outweigh the benefits the child would receive from a permanent adoptive home].)

Based on the totality of the evidence before it, the juvenile court reasonably could find that mother failed to establish her relationship with H.G. was "so important to the child that the security and stability of a new home wouldn't outweigh its loss." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The juvenile court accordingly did not err in finding that the beneficial parental relationship exception inapplicable.

## 2. ICWA Inquiry

Mother also challenges the order terminating her parental rights on the ground that the juvenile court and the Department failed to comply with the inquiry requirements of ICWA and related California law. Mother contends the court erred in finding ICWA inapplicable because the Department did not conduct a proper initial inquiry into whether H.G. is or may be an Indian child. We agree there was error but conclude it was not prejudicial and therefore affirm without conditions.

### a. The juvenile court erred in finding ICWA inapplicable on the record before it.

In involuntary state court proceedings concerning child custody, such as these dependency proceedings, ICWA requires notice to the relevant Indian tribe "where the court knows or has reason to know that an Indian child is involved." (25 U.S.C. § 1912(a).) It is incumbent upon the court administering such a proceeding to inquire whether the subject child is an Indian child. The scope of the duty on the court, as well as certain participants

17

in the proceeding, is defined by federal regulations and related state law. (See, e.g., 25 C.F.R. § 23.107 (2023); Welf. & Inst. Code, § 224.2; Cal. Rules of Court, rule 5.481.)

The duty of inquiry has three "phases." Mother claims error concerning the first. This phase—the "initial inquiry"— applies in every case. In broad terms, the initial inquiry requires the juvenile court and the Department to ask certain persons related to the proceedings about the child's possible Indian ancestry. (See § 224.2, subds. (a), (b), (c); *In re S.S.* (2022) 75 Cal.App.5th 575, 581; *In re D.F.* (2020) 55 Cal.App.5th 558, 566.) As relevant to mother's appeal, section 224.2, subdivision (b) requires a county welfare department, like the Department, to ask, among others, the child's "extended family members" about "whether the child is, or may be, an Indian child." (*Ibid.*) The requirement was added by amendment in 2018 and became effective in 2019. (Stats. 2018, ch. 833, § 5; *In re S.S.* (2023) 90 Cal.App.5th 694, 697.) Extended family members include adults who are the child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

A juvenile court's finding that ICWA does not apply in a proceeding implies that (a) neither the Department nor the court had a reason to know or believe the subject child is an Indian child; and (b) the Department fulfilled its duty of inquiry. (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

Mother claims error based on the Department's failure to inquire with maternal aunt and uncle—the extended family members with whom the Department had contact—about possible Indian ancestry. Mother is correct that the juvenile

18

court erred in finding ICWA inapplicable where the record showed contact between the Department and maternal aunt and uncle, but no record that they were asked about possible Indian ancestry. (See, e.g., *In re Darian R.* (2022) 75 Cal.App.5th 502, 509 [finding error where Department had contact with the maternal aunt and maternal grandfather but failed to inquire of them regarding Indian ancestry].)

### b. No prejudice resulting from the juvenile court's ICWA finding is shown.

Because the juvenile court's ICWA error was one of state law, it is reversible only if shown to be prejudicial. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742 (*Benjamin M.*), citing Cal. Const., art. VI, § 13.)

Mother argues the prejudice analysis does not apply because she requests not reversal of the order terminating her parental rights but a conditional affirmance subject to vacatur of the juvenile court's ICWA finding and remand for further inquiry into whether H.G. has Indian heritage. We disagree that the form of mother's request allows her to evade the burden of showing prejudice. The constitutional requirement that an appellant show prejudice from a claimed error is "grounded in the need for finality of judgments and conservation of judicial resources . . . ." (*People v. Vasquez* (2006) 39 Cal.4th 47, 70.)

Mother is requesting further proceedings in the juvenile court that threaten to delay the finality of H.G.'s permanent plan. This case is therefore unlike mother's cited authorities which involved ICWA appeals in earlier stages of the dependency proceedings where the appellate decision merely confirmed the county welfare department's continuing obligation to conduct a full inquiry during the ongoing proceedings. (See *In re S.H.*

19

(2022) 82 Cal.App.5th 166, 178 [affirming jurisdictional and dispositional orders despite lack of ICWA compliance where "the court, counsel, and the [county welfare department] [we]re aware of incomplete ICWA inquiry"]; *In re Dominick D.* (2022) 82 Cal.App.5th 560, 567 [affirming jurisdictional and dispositional findings and orders but vacating ICWA finding and directing compliance with county welfare department's inquiry obligations].) Here, mother's parental rights have been terminated and adoption has been selected as H.G.'s permanent plan. Considerations of finality take on heightened importance at this stage, rendering mother's authorities excusing prejudice inapplicable. (See *In re S.H.*, at p. 178 [noting "[a] more difficult question would be presented were this an appeal from an order terminating parental rights"].)

Courts are divided on what showing of prejudice warrants reversal for initial inquiry errors. "Some courts have addressed this problem by requiring an appellant who asserts a breach of the duty of inquiry to, at a minimum, make an offer of proof or other affirmative assertion of Indian heritage on appeal." (*In re S.S., supra,* 75 Cal.App.5th at pp. 581–582, citing cases.) Others have excused such a showing, effectively treating failure to inquire as error per se. (See, e.g., *In re Y.W.* (2021) 70 Cal.App.5th 542, 556; *In re J.C.* (2022) 77 Cal.App.5th 70, 80.) The Fourth Appellate District in *Benjamin M.*, *supra*, 70 Cal.App.5th 735, took a third approach, concluding that "a court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Id.* at p. 744.) Our court has taken

20

a fourth approach, concluding initial inquiry errors require reversal only when the record of proceedings in the court or a proffer of evidence made on appeal suggests a reason to believe that the child may be an Indian child.  (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 779, review granted Sept. 21, 2022, S275578.)

We have previously rejected the error per se line of cases.  (*In re M.M.* (2022) 81 Cal.App.5th 61, 71, review granted Oct. 12, 2022, S276099.)  Under any of the other three lines of cases, the court's error here was harmless.

On the record before us, there is no reason to believe there is readily obtainable information that is likely to bear meaningfully on whether H.G. has Indian ancestry under the *Benjamin M.* analysis.  In *Benjamin M.*, like here, the mother denied Indian ancestry.  (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 740.)  Thus, the *Benjamin M.* court was concerned only with the possibility of Indian ancestry on Benjamin's paternal side.  Like here, Benjamin's father did not participate in the proceedings before the juvenile court.  But unlike here, the identity of Benjamin's father was known.  The *Benjamin M.* court concluded that the "missing" information from the paternal side of Benjamin's family was readily available because the county welfare department had made, or could have made, contact with one or more paternal uncles.  If asked, a sibling of father "would likely have shed meaningful light on whether there is reason to believe Benjamin is an Indian child."  (*Id.* at p. 744.)  Here, the side of the family tree about which information is entirely "missing" is not known.  Although the parties attempted to establish paternity in the juvenile court, their efforts were unsuccessful.  As a result, H.G.'s biological paternal extended

21

family members are unknown and her case is unlike *Benjamin M.*

Further, we are offered no reason in the record to believe that maternal aunt and uncle would have better information about H.G.'s ancestry than mother did. Mother lived with maternal aunt, reducing the likelihood that maternal aunt would have knowledge relevant to the ICWA inquiry that had not been shared with mother. (See *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1015 ["All of the parents appear to have been in contact with their extended families, and thus the possibility that they might unknowingly be members of a tribe appears trivially small"].) Similarly, maternal uncle, whose childhood, like mother's, was spent in the foster system, was unlikely to have more or different information about Indian ancestry than mother did.

This is especially true given mother's history with the Department. Although prior dependency cases for mother's other children commenced prior to amendments to section 224.2 requiring inquiry with extended family members, Indian ancestry was nonetheless at issue in those cases. Given the repeated significance of the issue to her parental rights, we expect mother would have asked her relatives with whom she had contact about Indian heritage. But after multiple prior dependency cases, mother still "ha[s] no Indian ancestry as far as [she] know[s]."

Finally, no one has suggested any reason to believe H.G. might have Indian ancestry. Certainly, mother has made no offer of proof that H.G. is an Indian child. Given the absence of any evidence or claim that H.G. might have Indian ancestry, mother's "unvarnished contention that additional interviews of [maternal aunt and uncle] would have meaningfully elucidated [H.G.'s] Indian ancestry" does not support a finding of prejudice. (*In re*

*Darian R., supra,* 75 Cal.App.5th at p. 510.)

## DISPOSITION

The juvenile court's section 366.26 order terminating parental rights over H.G. is affirmed.


GRIMES, J.

I CONCUR:


STRATTON, P. J.

**VIRAMONTES, J., Concurring and Dissenting.**

I concur in the majority view that there was no error in the juvenile court's finding that the beneficial parental relationship exception did not apply. I also concur in the majority's conclusion that the juvenile court's finding that the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) did not apply was error.

I write separately because I dissent from the majority view that the ICWA error was harmless. I believe that the approach adopted by the Fifth District Court of Appeal in *In re K.H.* (2022) 84 Cal.App.5th 566 (*K.H.*) is the correct one in evaluating whether an inquiry error is prejudicial. " 'ICWA compliance presents a unique situation' " because its purpose, and the purpose of the California statutes that implement it, " 'is to provide notice to the tribe sufficient to allow it to determine whether the child is an Indian child, and whether the tribe wishes to intervene in the proceedings.' " (*Id*. at p. 608.) Accordingly, in assessing whether an inquiry error is prejudicial, "the relevant injury under ICWA is not tied to whether the appealing parent can demonstrate to the juvenile court or a reviewing court a likelihood of success on the merits of whether a child is an Indian child. The relevant rights under ICWA belong to Indian tribes and they have a statutory right to receive notice where an Indian child may be involved so that they may make that determination. It necessarily follows that the prejudice to those rights lies in the failure to gather and record the very information the juvenile court needs to ensure accuracy in determining whether further inquiry or notice is required, and whether ICWA does or does not apply." (*Id*. at p. 591.) Where

1

there has not been an adequate inquiry, "the error is prejudicial because neither the agency nor the court gathered information sufficient to ensure a reliable finding that ICWA does not apply and remanding for an adequate inquiry in the first instance is the only meaningful way to safeguard the rights at issue." (*Ibid*.)

Applying the approach articulated in *K.H.*, I conclude that the juvenile court's ICWA error was prejudicial. Here, the Los Angeles County Department of Children and Family Services (DCFS) was in contact with both the maternal aunt and the maternal uncle, but failed to inquire of either of these extended family members. This left the juvenile court without sufficient evidence upon which to find the inquiry was proper, adequate, and duly diligent. As in *K.H.*, the error was prejudicial because "the inquiry fell well short of that required to gather the information needed to meaningfully safeguard the rights of the tribes, as intended under ICWA and California law." (*K.H.*, *supra*, 84 Cal.App.5th at p. 620.) I also note, as does *K.H.*, that this does not constitute a per se reversal rule. (*Id.* at p. 618.) There could be instances where the record shows that certain inquiry errors were harmless because a party refused to cooperate, DCFS did not have adequate contact information, or DCFS's inquiry included sufficient extended family members to safeguard the rights of the tribes. Under these facts, however, the error was prejudicial, and remand for an adequate inquiry in the first instance is required.

VIRAMONTES, J.

2